710 P.2d 1066

**MOUNTAIN SHADOWS RESORT HO-TEL, (Del E. Webb Corporation), Petitioner Employer,**

**Northwestern National Insurance Company, c/o Scott Wetzel Services, Inc., Petitioner Carrier,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Howard Brown, Respondent Employee.**

No. 1 CA–IC 3120.

Court of Appeals of Arizona, Division 1, Department A.

July 5, 1985.

Reconsideration Denied Sept. 6, 1985.

Lewis & Roca by Merton E. Marks and R. Todd Lundmark, Phoenix, for petitioner employer and petitioner carrier.

Dennis P. Kavanaugh, Chief Counsel, Phoenix, for respondent, The Indus. Com'n of Arizona.

Charles M. Wilmer, P.C. by Charles M. Wilmer, Phoenix, for respondent employee.

## OPINION

HAIRE, Presiding Judge.

The primary issues raised by the petitioners (hereinafter collectively referred to as carrier) are whether the administrative law judge erred in allowing the respondent employee (claimant) to change physicians and whether there is evidence to support the administrative law judge's award for a scheduled 100% loss of use of claimant's right leg. In a request for affirmative relief, the claimant also urges that the award be set aside, contending that the administrative law judge erred in finding that his condition was stationary.

We consider first the issue concerning the claimant's request for permission to change physicians. Claimant injured his right knee in an industrial accident. His treating orthopedic physician was Dr. Howard P. Aidem. While still under Dr. Aidem's care, claimant consulted another orthopedic surgeon, Dr. Willard H. Hunter. After an examination by Dr. Aidem subsequent to claimant's consultation with Dr. Hunter, Dr. Aidem remained of the opinion that nothing further could be done to improve claimant's condition. In essence, he disagreed with Dr. Hunter's recommendation that a third operation known as a "Slocum Procedure" should be performed. However, Dr. Aidem affirmatively consented to the claimant's request for a change of doctor by writing a letter stating that in his opinion claimant should be seen by Dr. Hunter who felt claimant could benefit by surgery.

The carrier rejected claimant's request for permission to change doctors, and a hearing was held on this issue as well as the other issues raised in this review. The carrier contended that the request for change of physicians was governed by Commission Rule A.C.R.R. R4–13–113(B) and (C) (hereinafter referred to as Rule 13), which provides:

"B. Except as provided by law, an injured employee will not be permitted to voluntarily change from one hospital to another, or from one physician to another, without the written authorization of the insurance carrier or the Commission.

"C. The Commission may, upon application of an interested party or upon its own motion, order a change of a physician or conditions of treatment when there are reasonable grounds to believe that the health, life or recovery of any employee is retarded, endangered, or impaired thereby, or where, in the judgment of the Commission, his recovery may be expedited."

Under subsection (C) of the above-quoted rule, the Commission may order a change of physicians only when there are reasonable grounds to believe that the health, life or recovery of the employee is retarded, endangered, or impaired thereby or where his recovery may be expedited. Since the administrative law judge did not find that such grounds existed in this case or that claimant's recovery might be expedited by the requested change, the carrier contends

that the administrative law judge's award authorizing the change was erroneous.

The claimant contends, however, that the written consent of his attending physician was sufficient authorization for the change, relying on A.R.S. § 23–1071(B):

"B. No employee may change doctors without the written authorization of the insurance carrier, the commission or the attending physician."

Thus, there appears to be a conflict between A.R.S. § 23–1071(B), which allows an employee to change physicians upon obtaining the written consent of his attending physician, and the Commission's Rule 13(B) and (C), which arguably permits a change only upon a showing of additional circumstances.

■ Although A.R.S. § 23–1071(B) is written in negative terms and does not affirmatively state that an employee may change physicians with the consent of his attending physician, it is our opinion that by implication this is the clear intent of the statute. Legislative intent may be determined from necessary implication as to what was intended. What is necessarily implied is as much a part of the statute as what is expressed. *See Coggins v. Ely,* 23 Ariz. 155, 202 P. 391 (1921).

Before proceeding further with the discussion of this apparent conflict, we note that the employer in this case is not an employer who has elected to provide medical benefits to his employees in accordance with A.R.S. § 23–1070. If such were the case, § 23–1070(E) rather than § 23–1071(B), sets forth the circumstances under which the Commission may allow a claimant to change physician without the employer's consent. This standard is practically identical to that set forth in the Commission's Rule 13(C), requiring a showing of risk of endangering the employee's health, life or recovery before the Commission may order a change of physicians. There is no provision analogous to § 23–1071(B) applicable to § 23–1070 employers, so their employees do not have the right implied by that section to change physi-

cians upon the written consent of the attending physician.

■ The Commission's Rule 13(C), while compatible with § 23–1070(E), does not limit itself to circumstances involving a § 23–1070 employer and is accordingly invalid insofar as it conflicts with § 23–1070(B). Its terms are broadly applicable to all situations involving a change of physicians without the consent of the carrier. The administrative law judge failed to see any conflict between the statute and the rule, reasoning that Rule 13(C) merely sets forth one condition under which the Commission may order a change of physicians and that the rule is not exclusive and does not purport to preclude the Commission from allowing a change under § 23–1071(B) which "on its face implies that the written authorization of an attending physician is sufficient." The initial language of Rule 13(B) which makes its provisions applicable "except as provided by law" supports this position.

■ We agree with the administrative law judge's conclusion that the provisions of 13(C) do not preclude the Commission from granting consent pursuant to § 23–1071(B) to a change of physician when the attending physician's written authorization has been obtained. To the extent that the Commission's rule might be interpreted otherwise in a case not involving a § 23–1070 employer, it would be contrary to the governing statute and therefore invalid. Implementing an administrative rule or regulation which conflicts with an applicable statute is beyond the parameters of the statutory grant of rulemaking authority to the administrative agency and thus not enforceable. *State Board of Barber Examiners v. Walker,* 67 Ariz. 156, 192 P.2d 723 (1948); *ITT Courier v. Industrial Commission,* 141 Ariz. 357, 687 P.2d 365 (App. 1984); *Kennecott Copper Corp. v. Industrial Commission,* 115 Ariz. 184, 564 P.2d 407 (1977). We therefore hold that the administrative law judge did not err in authorizing a change of physicians in this case.

We consider next the carrier's contention that the evidence does not support the ad-

ministrative law judge's award of a scheduled 100% loss of use of claimant's right leg as the result of the industrial injury. The administrative law judge's findings on this issue were in part as follows:

"21. As to the percent of impairment to the applicant's right knee all of the physicians agreed that pursuant to the AMA Guides alone the applicant had a 10% permanent impairment of his right leg. However, the applicant has argued that the applicant's permanent impairment should be substantially greater based upon the rationale as set forth in the recent case of *Dutra v. Industrial Commission*, 135 Ariz. 59, 659 P.2d 18 (1983).

"22. The Court held in that case that: "... [A]s to scheduled injuries, compensation is based upon the job the claimant was performing at the time of the injury. Inability to perform the claimant's particular job at the time of his injury must be considered in determining the extent of the workman's disability...."

"23. Admittedly this case has created a drastic change in the computation of percent of permanent impairment on scheduled injuries. The Court has stated that in addition to the AMA Guidelines the Administrative Law Judges must also take into consideration the applicant's inability to perform his former work in providing a percent of impairment. However, the Courts have not provided any guidelines as to how exactly this inability to perform further work should be converted to percentage of disability of a scheduled injury. * * * In the instant case there was testimony that the applicant has 46% strength in his right leg as compared to the strength in his left leg."

"24. In the present case the conflict in the evidence has been presented on the issue of whether or not the applicant's industrial injury has affected his ability to perform work as a houseman. The

testimony of the applicant and the testimony of Dr. Aidem was to the affect [sic] that the applicant was not capable of obtaining employment or returning to his former work because of the instability of the applicant's right leg together with his need to be supported by crutches or a cane. On the other hand, Dr. Chandler testified that the applicant could return to his job duties as a houseman and likewise the group consultation report from the Southwest Disability Evaluation Center stated that in the opinion of the group the applicant was capable of returning to his regular duties.

"25. In the instant case, a conflict in the medical evidence has been presented between the testimony of Dr. Aidem and the testimony of Dr. Chandler and the report from the Southwest Disability Evaluation Center. The undersigned resolves the conflict by accepting the testimony of Dr. Aidem as being the more reasonable based upon a fact that Dr. Aidem was applicant's treating physician together with the fact that Dr. Chandler and the group were of the opinion that the atrophy in the applicant's leg was not a result of the industrial incident, together with the fact that objective testing by the cybex machine had demonstrated a substantial loss of strength in the applicant's right leg. It is therefore found that the applicant is incapable of returning to any other employment as a result of the industrial injury. Therefore, it is logical to assume that he then has a total disability as a result of the industrial injury and that he is therefore entitled to a scheduled disability equivalent to a 100% loss of his right leg based upon the rationale as expressed in *Dutra v. Industrial Commission*, OP. Cit." [1]

In *Gomez v. Industrial Commission*, 1 CA–IC 3130 (Ariz.App. May 14, 1985), this court exhaustively analyzed the Arizona Supreme Court's decision in *Dutra v. In-*

---

1. Paragraphs 21, 22 and 23 are from the administrative law judge's decision and award dated June 30, 1983. Paragraphs 24, and 25 are from the administrative law judge's Decision Upon Review dated November 22, 1983. These paragraphs were substituted for paragraphs 24 and 25 of the June 30, 1983 decision.

*dustrial Commission*, 135 Ariz. 59, 659 P.2d 18 (1983). We do not intend to repeat that analysis here, except to say that the administrative law judge's decision in this proceeding reinforces our conclusion that guidance is urgently needed in order that there may be some semblance of uniformity in the application of *Dutra* by the Industrial Commission's administrative law judges. In *Gomez* we offered the following as guidance pending further direction from the Arizona Supreme Court in this area:

> "In our opinion *Dutra* does not authorize a reduction of the percentage of impairment established pursuant to the American Medical Association Guides for a scheduled injury award, even though the injury does not adversely affect the claimant's ability to perform in his former employment. In other words, loss of use established in accordance with prior statutory and decisional law will constitute a minimum basis for the award, which is subject to increase if appropriate evidence is introduced showing an adverse effect on the claimant's ability to perform in his former employment. A contrary interpretation would further eviscerate the relevant statutory provisions. Additionally, in our opinion, evidence relating to a claimant's loss of ability to perform his former employment will be of increased importance in those cases, such as in *Dutra*, in which the American Medical Association guides for rating impairment do not adequately measure the true extent of impairment. In regard to the effect of the injury on the ability of a claimant to perform tasks of his former employment, consideration should be given to the various physical requirements of the former occupation which claimant can no longer perform as compared to those physical tasks of his former employment in which claimant's ability to perform is unaffected. Thus, the fact that a claimant is no longer able to work at his former employment because of his inability to perform minor, but essential tasks of his former employment, will not mandate a finding of 100% loss of use."

*Gomez*, slip op. at 19–20.

We further stated:

> "The evaluation of such evidence and the determination of the ultimate percentage of loss of use by the administrative law judge will of necessity involve considerable discretion, but in all cases in which the award varies from the percentage of impairment shown pursuant to a Commission established rating schedule as authorized by A.R.S. § 23–1044(G), the evidence presented relating to the tasks of a claimant's prior employment and the claimant's inability to perform certain tasks must be presented in sufficient detail to enable the administrative law judge to make an informed comparative evaluation thereof."

*Id.* at 20.

Applying the above guidelines to the facts of this case, it is apparent that the administrative law judge did not attempt to reduce the award for loss of use below the percentage of impairment established by the American Medical Association Guides. As indicated by the administrative law judge in his findings, all of the medical witnesses agree that under the American Medical Association Guides alone, the claimant had a 10% impairment of his right leg, whereas the award was for 100%.

Considering next whether the American Medical Association Guides represented a true measure of the impairment, the evidence is unclear and the administrative law judge made no findings in this regard. There was a finding that there was evidence that claimant's right leg had only 46% of the strength of his left leg, but, there is evidence that some of the medical witnesses who found a 10% impairment under the American Medical Association Guides took into consideration claimant's loss of strength in his right leg due to muscle atrophy.

It is in the area of the evidence relating to claimant's inability to perform the tasks of his former employment that we find the greatest deficiency under a *Dutra* analysis.

Although the administrative law judge found that the testimony of the claimant was to the effect that he was not capable of obtaining employment or returning to his former work, the carrier contends that the finding is not supported by the record. The claimant has not responded to this contention by referring this court to any such testimony by claimant. Our independent review of the record reveals *no* testimony by claimant that he was unable to return to his former employment or unable to perform any of the tasks thereof. The only testimony of the claimant relating to his former employment is that he was a "houseman" which was a "glorified janitor." In answer to a question as to what sort of work he did as a janitor, claimant responded: "Oh, vacuumed and cleaned and that was about the extent of it." To reiterate, claimant did not testify as to his ability to perform the duties of his former employment, or any other employment.

Dr. Aidem testified that he had a general understanding based upon claimant's general statement to him of what claimant's work entailed, and that in his opinion claimant, at the time of his examination by Dr. Aidem, was not capable of any type of work and could not perform the tasks of his employment. He stated: "I would have no other option but to agree with the patient, when he said he couldn't do it. I *would not argue with him about it.*" On the other hand, it was the opinion of Dr. Chandler that claimant could return to the duties of his former employment. The administrative law judge in the exercise of his authority to resolve conflicts decided to accept the testimony of Dr. Aidem, and we mention the conflicting testimony only to demonstrate the wide variance in the medical opinion and the almost complete absence of any real detail concerning the tasks of claimant's prior employment, and concerning the effect of claimant's impairment on the performance of specific tasks.

The absence of such evidence in this record is all the more confusing, since the Arizona Supreme Court's *Dutra* decision was issued the day before the second hearing in this matter, and claimant's counsel was familiar with its contents. At the hearing of January 7, 1983, and after the receipt of the testimony of Dr. Aidem referred to above, there was a discussion upon the record concerning the need for a further hearing. Claimant's counsel recognized the deficiency of the record and indicated his intention, in view of the *Dutra* decision, to introduce further evidence concerning the physical requirements of his employment, stating: "We also need a subpoena for an individual who can describe all of the work responsibilities of [claimant] at his regular job. We would then have Dr. Whisler testify after the description of employment duties is in the record." Again, later in the discussion concerning the possibility of questioning Dr. Hunter, counsel repeated this concern: "The only problem that I can see are the specific preliminary activities of [claimant] are not truly itemized in the record. . . ."

Another hearing was thereafter held, and notwithstanding counsel's expressed concern for the sufficiency of the record relating to the tasks and activities involved in claimant's prior employment, no evidence was presented to correct these deficiencies. In *Gomez* we cautioned that in order to support an award which varies from the percentage of impairment shown pursuant to a Commission established rating schedule:

> "the evidence presented relating to the tasks of a claimant's prior employment and the claimant's inability to perform certain tasks must be presented in sufficient detail to enable the administrative law judge to make an informed comparative evaluation thereof." *Gomez*, slip op. at 20.

Here, the evidence was insufficient to enable the administrative law judge to make an informed comparative evaluation, and accordingly, the award must be set aside

There remains for consideration by the court claimant's request for affirmative

relief.[2] Claimant has also requested that the award be set aside, contending that the administrative law judge erred in finding that his condition was stationary. The administrative law judge's findings in regard to this question are:

"16. As to whether or not the applicant's physical condition has become stationary an additional conflict in the medical evidence arose with the testimony and medical reports of Dr. Whisler and Dr. Hunter on one hand stating that the applicant was in need of further active medical treatment consisting of physical therapy and additional bracing and the possibility of additional surgery to repair the instability in the applicant's right knee, as opposed to the testimony and medical reports of Dr. Chandler and the Southwest Disability Evaluation Center and the opinion expressed by Dr. Aidem. Dr. Chandler and the report from the Southwest Disability Evaluation Center showed that it was their opinion that the applicant's physical condition had become stationary and that no further surgical procedures or additional bracing for the applicant's knee was necessary. Dr. Chandler in this regard testified that the surgical procedure recommended by Dr. Hunter and the intricate bracing procedure recommended by Dr. Whisler were contraindicated because the applicant did not have any severe ligamentous instability and in particular did not have any torn anterior cruciate ligament. Dr. Aidem testified that in his opinion the applicant's condition was not improving but that he was unaware of any other medical treatment to be rendered to the applicant to improve his condition. Dr. [Aidem] stated that in his opinion he did not think that the surgical procedure as recommended by Dr. Hunter would be successful to improve the applicant but that he had no objection to the applicant being

treated by Dr. Hunter. Dr. Aidem's report and his testimony show that Dr. Aidem was unable to find any anterior cruciate ligament torn despite his examination of the applicant's knee through an arthroscope.

"17. On the issue as to whether or not the applicant's physical condition has become stationary, the conflict in the medical evidence is resolved by the undersigned by accepting the testimony of Dr. Chandler as supported by the inferences of Dr. Aidem and the reports from the Southwest Disability Evaluation Center that the applicant's physical condition had become stationary as of September 14, 1982. The basis for accepting this testimony as being the more reasonable is based upon the fact that Dr. Chandler's expertise in the field of knee surgery together with the fact that the treatment recommended by Dr. Whisler and Dr. Hunter was for severe ligamentous damage when there was no evidence of any severe ligamentous damage as seen by Dr. Aidem during his prior surgeries. Additionally, the applicant had previously been instructed on an exercise program to attempt to alleviate the severe atrophy in his right thigh without success. Additionally, the medical report of Dr. Miller shows that the likelihood of improvement of the atrophy with extensive physical therapy after the passage of so much time as poor.

"18. The evidence therefore establishes that the applicant's physical condition as it related to the industrial injury became stationary on September 14, 1982 and as of that date the applicant had a permanent impairment to his right leg."

The record furnishes full support for these findings and, based on such findings, the administrative law judge's conclusion that claimant's condition was stationary is legally sound. We recognize that the ad-

**2.** In the exercise of our discretion we decline to consider the carrier's contention that A.R.S. § 23–952 is unconstitutional insofar as it requires a carrier to pay certain benefits pending appellate review without providing an appropriate mechanism which insures that the carrier will be able to recoup amounts wrongfully paid. As the claimant points out, the carrier has not complied with such statute, and there has been no commission or court order which mandates compliance in this case.

ministrative law judge could well have resolved the conflicts in favor of claimant's desires for further surgery on his knee. We can understand claimant's consternation when his request for change of physicians was allowed by the administrative law judge, with the judge at the same time in the same decision finding that claimant's condition was stationary, thereby precluding claimant from obtaining the further surgery which the new physician recommended. We can only state that with the passage of time and since the award is being set aside for the reasons previously stated, claimant will have the opportunity to again present evidence to the Commission concerning this issue.

The award is set aside.

BROOKS and GRANT, JJ., concur.